UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-20824-CIV- O'SULLIVAN

[CONSENT]

SEXUAL MD SOLUTIONS, LLC,

      Plaintiff,

v.

DUSTIN WOLFF, STEPHANIE WOLFF,
WOLFF MARKETING ENTERPRISES, LLC,
NOVUS ANTI-AGING CENTER, INC.,
and MOON POOL LLC,

      Defendants.

_____/

## ORDER

THIS MATTER is before the Court on the Motion for Preliminary Injunction (DE# 62, 4/6/20) filed by the plaintiff.

## BACKGROUND

On March 18, 2020, Sexual MD Solutions, LLC (hereinafter "SMDS" or "plaintiff") filed its Amended Complaint (DE# 43, 3/18/20). The Amended Complaint alleged the following causes of action against Dustin Wolff, Stephanie Wolff, Wolff Marketing Enterprises, LLC, Novus Anti-Aging Center, Inc. and Moon Pool LLC (hereinafter collectively, "defendants"): breach of contract against Dustin Wolff, Stephanie Wolff and Novus Anti-Aging Center, Inc. only (Count I); misappropriation of trade secrets (Count II); unfair competition (Count III) and unjust enrichment (Count IV). Id.

On April 6, 2020, the plaintiff filed its Motion for Preliminary Injunction (DE# 62, 4/6/20) (hereinafter "Motion").[1] On April 17, 2020, the defendants filed their response to

_____

[1] The plaintiff initially sought injunctive relief in state court. See Notice of Removal (DE# 1, 2/26/20). At the undersigned's direction, the plaintiff re-filed the motion for injunctive

the Motion. <u>See</u> Defendants Dustin Wolff <u>et al.</u>'s Response in Opposition to Plaintiff's Motion for Temporary Injunction (DE# 69, 4/17/20) (hereinafter "Response"). The plaintiff filed its reply on April 21, 2020. <u>See</u> Plaintiff's Reply in Support of Its Motion for Preliminary Injunction (DE# 87, 4/21/20). The parties filed numerous supporting documents including declarations and exhibits.

On April 24, 2020, the undersigned held an evidentiary hearing on the instant motion. The undersigned admitted into evidence the Plaintiff's Exhibits 1 through 42 and the Defendants' Exhibits 1 through 92. At the evidentiary hearing, the plaintiff presented the testimony of Mark White, Dustin Wolff and Jon Hoffman. The defendants presented the testimony of Dustin Wolff.

This matter is ripe for adjudication.

## <u>FACTUAL FINDINGS</u>

### I.   SMDS

The plaintiff, SMDS, is a Florida Limited Liability Company, with its principal place of business in Aventura, Florida. Amended Complaint (DE# 43 at ¶1, 3/18/20).

In 2016, Mark White founded SMDS "after learning about extracorporeal shockwave therapy ('ESWT'), a method of treatment for . . . erectile dysfunction that applies high-frequency, low-intensity shock waves to the body." Motion at 3; <u>see</u> <u>also</u> Declaration of Mark White (DE# 63-1 at ¶¶4, 6, 9, 4/7/20). At the time, doctors in the United States had not "caught on" to the use of ESWT as a treatment for erectile

---

relief as a separate entry on the docket, Motion for Temporary Injunction (DE# 13, 3/2/20). On April 1, 2020, the Court denied as moot the Motion for Temporary Injunction (DE# 13, 3/2/20) when the plaintiff advised the Court that it would be filing the instant Motion. <u>See</u> Order (DE# 61, 4/1/20).

dysfunction (hereinafter "ED"). Id. at ¶7.[2]

### A.   Development of the GAINSWave Program

Mark White "devoted nine full months of [business] planning . . . and spent millions of dollars" developing the GAINSWave program. Declaration of Mark White (DE# 63-1 at ¶10, 4/7/20). The purpose of the GAINSWave program was to "market high-frequency, low intensity shock wave therapy as a safe, non-invasive technology to increase the blood flow to the penis and thereby optimize erections, sensitivity, and sexual performance." Id. at ¶13

### B.   SMDS' Business Model

SMDS is a marketing company. It does "not make, sell or lease any medical devices." Defendant's Exhibit 7 at NOVUS000169 (DE# 77, 4/19/20).[3] SMDS' target market is medical providers. Declaration of Mark White (DE# 63-1 at ¶12, 4/7/20) (explaining that "for purposes of safety and quality control, trained physicians -- many of whom already had patients interested in ED treatments, and who were in a position to better explain and administer the treatment -- became the target market for SMDS."). In fact, SMDS has rejected non-medical providers who have expressed interest in becoming GAINSWave providers. Id. at ¶26.

SMDS developed "training courses for physicians and physicians' assistant

---

[2] Dustin Wolff attested that there was at least one clinic in Boston providing ESWT treatments since 2014. Declaration of Dustin Wolff (DE# 75 at ¶16, 4/17/20). However, according to the plaintiff, the clinic in Boston did not "launch[ ] their brand" until October 2018. Reply Declaration of Mark White (DE# 87-1 at ¶36, 4/21/20).

[3]  The Court will cite to the "Bates stamp" page number in instances where the page numbers automatically assigned by the Court's CM/ECF system are illegible.

groups to provide training - not only in the treatment - but far more importantly in the sales, marketing and operational aspects of selling the treatment." Declaration of Mark White (DE# 63-1 at ¶12, 4/7/20). Some of the "trade secrets and confidential information" developed by SMDS include "opportunity analyses, . . . marketing techniques, sales strategies, comparison data, pipelines, . . . 'lead-generation' strategies, customer/client lists and data, business plans and training videos." Id. at ¶11.

"The key part of SMDS's business has been creating awareness of the [GAINSWave] treatment, and its benefits and effectiveness." Declaration of Mark White (DE# 63-1 at ¶15, 4/7/20). To accomplish this objective, "SMDS hired certain key 'influencers' who could talk about the [GAINSWave] treatment in a positive way[ ] and b[ought] certain key words that would put the advertisements front and center for certain internet searches." Id. at ¶16. "[T]his brand awareness drives potential clients to the GAINSWave website, whereby the consumer can find a local [GAINSWave] provider that offers the treatment." Id. at ¶17. "Providers who pay SMDS a monthly subscription" are "listed on [the GAINSWave] website. The more traffic the GAINSWave website receives, the more valuable the SMDS subscription becomes." Id. at 18.

### C.   Protective Measures and Membership Agreement

To protect its "business interests and trade secrets," SMDS has undertaken the

following measures:

> a. restricting use of the information with a . . . restrictive covenant,
>
> b. licensing [the information] only to properly licensed medical practitioners,
>
> c. avoiding licensing [the information] to competing business entities, and
>
> d. limiting access to a password protected marketing "portal" that contains many materials related to SMDS's proprietary information and techniques (hereinafter, the "Portal").

Declaration of Mark White (DE# 63-1 at ¶22, 4/7/20).

Physicians or physician's assistants who wish to have access to SMDS' proprietary information must sign the GAINSWave™ Membership Agreement.

Declaration of Mark White (DE# 63-1 at ¶23, 4/7/20). The GAINSWave™ Membership Agreement states, in part, that:

> NON-CIRCUMVENT & CONFIDENTIALITY. Physician acknowledges and agrees that: (a) SMDS Invested substantially to develop and create this opportunity, to establish the Intellectual Property and related goodwill and business relationships, and to protect the Confidential Information (collectively, "Business Information"); (b) Physician intends to benefit from the Business Information under this Agreement; (c) the benefit to Physician is substantial and the Business Information unique; and (d) the Business Information would be difficult and costly for Physician to learn, develop, and use independently, and (e) has substantial competitive value. For these and other reasons, Physician agrees SMDS has a legitimate business Interest in protecting the Business Information.
>
> **Physician therefore agrees that during the Term of this Agreement and for two (2) years after this Agreement ends (the "Restrictive Period"), Physician will not create any new or different intellectual property use[d] to market, or participate in any group or collective marketing program that markets, the treatment of sexual wellness or related medical conditions using ESWT or similar technologies.**

GAINSWave™ Membership Agreement (DE# 76-1 at ¶6, 4/19/20) (emphasis added). In

the past, SMDS has rejected "individuals [who] tried to modify or eliminate the noncompete provision found in the [GAINSWave™] Membership Agreement or otherwise negotiate a less restrictive covenant." Declaration of Mark White (DE# 63-1 at ¶¶ 27-28, 4/7/20).

### D.    The Portal

SMDS' Portal contains "all materials related to SMDS's proprietary methods, the turnkey business strategies and the contents of the business." Motion at 5. The Portal is accessible only through the GAINSWave website. See Declaration of Mark White (DE# 63-1 at ¶¶30-31, 4/7/20) (explaining that "[a]ny person wishing to access the trade secrets must first obtain . . . log-in information from SMDS; without it, access to the Portal would be impossible.").

A medical provider who has signed the GAINSWave™ Membership Agreement and pays a monthly fee may access the Portal by entering their "unique user credentials and a password." Motion at 5; see also Declaration of Mark White (DE# 63-1 at ¶¶ 23, 25, 29, 4/7/20) (stating that "[t]raining and access to the Portal is limited only to medical practices, physicians and physician assistants who agree to the restrictive covenant and agree to pay a set monthly fee based on the level of access requested.").

### E.    The GAINSWave Program's Growth

"[S]ince 2016, more than 400 physicians [in 44 different states] have signed SMDS Membership Agreements and have paid approximately $900 per month for the training and the access to the Portal." Declaration of Mark White (DE# 63-1 at ¶¶34-35, 4/7/20). These medical providers have "used the GAINSWave treatment to treat more

6

than 50,000 patients in … the last three years." Id. at 35.

### F.    Other Companies Offering In-Home Treatments

Aside from the defendants, SMDS is aware of another company that "has created an in-home device that delivers the same shock wave therapy." Declaration of Mark White (DE# 63-1 at ¶37, 4/7/20). However, that company has not had access to SMDS' training and proprietary information and "SMDS has not received a single complaint from any of its physicians or influencers or anyone else about [that company]'s in-home device." Id. at ¶¶ 39. Other companies that have "offer[ed] in-home devices" and have not had access SMDS' training and proprietary information have failed. Id. at ¶40.

### G.    The '127 Patent Lawsuit

In July or August 2018, an individual "claiming that he had a methodology patent on shock wave therapy for ED," U.S. Patent No. 7,601,127 ("the '127 Patent"), sued the plaintiff and three GAINSWave providers in Georgia. Evidentiary Hearing Transcript (DE# 121 at 69, 4/28/20). This same individual threatened to sue every GAINSWave provider in the country for infringing on the '127 Patent. Id. The plaintiff reached a settlement agreement wherein this individual would not sue GAINSWave providers but would sue other medical providers. Id. As part of the settlement, the plaintiff agreed to provide this individual with the names of medical providers who were providing shock wave therapy. Id. After approximately three months, the plaintiff stopped providing names to that individual. Id. at 70.

## II.      The Defendants

### A.      Novus Anti-Aging Center, Inc.

In 2017, Dustin Wolff and Stephanie Wolff founded Novus Anti-Aging Center, Inc. in Los Angeles, California. Declaration of Dustin Wolff (DE# 75 at ¶9, 4/17/20). Stephanie Wolff is the chief executive officer of Novus Anti-Aging Center, Inc. and Dustin Wolff is its president. Declaration of Stephanie Wolff (DE# 69-3 at ¶9, 4/17/20); Declaration of Dustin Wolff (DE# 75 at ¶10, 4/17/20).

Stephanie Wolff is a Board-Certified Physician's Assistant. Declaration of Stephanie Wolff (DE# 69-3 at ¶11, 4/17/20). Dustin Wolff has "two decades of experience in sales and marketing, including internet marketing, in the field of male anti-aging and sexual wellness products." Declaration of Dustin Wolff (DE# 75 at ¶15, 4/17/20).

Novus Anti-Aging Center, Inc. "provides holistic healthcare and wellness services for the older population, which include sexual wellness therapies for both men and women, hormone-based therapies, chronic-pain management, and aesthetics." Stephanie Wolff (DE# 69-3 at ¶10, 4/17/20).

Prior to signing up with SMDS, Novus Anti-Aging Center, Inc. "researched the field extensively including protocols, marketing tactics, and different vendors who supported clinicians offering ESWT in their clinics." Declaration of Dustin Wolff (DE# 75 at ¶17, 4/17/20).

On October 5, 2017, Dustin Wolff signed a GAINSWave™ Membership Agreement on behalf of Novus Anti-Aging Center, Inc. See GAINSWave™ Membership

Agreement (DE# 76-1, 4/19/20).[4]

The Membership Agreement contained the following restrictive covenant:

**NON-CIRCUMVENT & CONFIDENTIALITY**. Physician acknowledges and agrees that: (a) SMDS Invested substantially to develop and create this opportunity, to establish the Intellectual Property and related goodwill and business relationships, and to protect the Confidential Information (collectively, "Business Information"); (b) Physician intends to benefit from the Business Information under this Agreement; (c) the benefit to Physician is substantial and the Business Information unique; and (d) the Business Information would be difficult and costly for Physician to learn, develop, and use independently, and (e) has substantial competitive value. For these and other reasons, Physician agrees SMDS has a legitimate business Interest in protecting the Business Information.

**Physician therefore agrees that during the Term of this Agreement and for two (2) years after this Agreement ends (the "Restrictive Period"), Physician will not create any new or different intellectual property use[d] to market, or participate in any group or collective marketing program that markets, the treatment of sexual wellness or related medical conditions using ESWT or similar technologies.**

GAINSWave™ Membership Agreement (DE# 76-1 at ¶6, 4/19/20) (emphasis added).

The GAINSWave™ Membership Agreement also contained a termination

provision and a forum selection clause:

**TERM & TERMINATION**. The initial term of this Agreement is one (1) year from the Effective Date. This Agreement renews automatically for one (1) year renewal terms. Together, the initial term and any renewal terms are the "Term." **This Agreement may be terminated**: (a) by mutual agreement of the parties; **(b) by Physician for cause if SMDS does not**

---

[4] For purposes of ruling on the instant Motion, the Court finds that, at the very least, defendant Novus Anti-Aging Center, Inc. was a signatory to the GAINSWave™ Membership Agreement (DE# 76-1, 4/19/20). At this juncture, the Court does not need to determine whether defendants Dustin Wolff and Stephanie Wolff, in their individual capacities, were also signatories to the GAINSWave™ Membership Agreement (DE# 76-1, 4/19/20) because, as explained in further detail herein, the Court may issue an injunction against all parties and non-parties who are "officers, agents, servants, employees, and attorneys" of Novus Anti-Aging Center, Inc. and "other persons who are in active concert or participation with [those individuals]" Fed. R. Civ. P. 65(d)(2)(B)-(C).

**cure within thirty (30) days after notice**; (c) by SMDS for non-payment that is not cured within five (5) days after notice; (d) by SMDS for other cause if Physician does not cure within thirty (30) days after notice; or (e) by SMDS immediately if SMDS reasonably determines Physician risks the value or reputation of the Intellectual Property or SMDS. **When this Agreement ends, Physician shall immediately: (a) cease using the Intellectual Property (including protocols) and any derivatives; (b) return all Intellectual Property, including the Marketing Tool Kit, and all other [sic]**.

***

**MISCELLANEOUS**. This Agreement will be governed by and construed in accordance with the laws of the State of Florida, without regard for conflicts of laws principles. **The mandatory and exclusive venue and jurisdiction for any proceeding to enforce this Agreement are courts located in Miami-Dade County, Florida. Each party waives any objection or defense based on venue, personal jurisdiction, or that the forum is not convenient**. . . .

Id. at ¶¶5,8 (emphasis added).

After signing the GAINSWave™ Membership Agreement (DE# 76-1, 4/19/20) and paying the set-up fee, Novus Anti-Aging Center, Inc. gained access to the Portal. Declaration of Dustin Wolff (DE# 75 at ¶¶21-22, 4/17/20).

SMDS provided training to its GAINSWave providers. The training consisted of "[three] hours of 'Business, operations, marketing and sales' and [four] hours of 'Medical, didactic and clinical training.'" Declaration of Dustin Wolff (DE# 75 at ¶23, 4/17/20). SMDS also provided materials to its providers, including marketing materials, but "did not mark any materials as confidential, proprietary or trade secrets." Id. at ¶¶31-38.

On November 5, 2017, Dustin Wolff and Stephanie Wolff attended an SMDS training session in Tucson, Arizona. Declaration of Dustin Wolff (DE# 75 at ¶25, 4/17/20). Due to a scheduling conflict, the training in Arizona "was cut short to about half

10

the expected seven hours." Id. at ¶27. To make up for this training, "SMDS offered compensatory training in Florida for a single day in February 2018." Id. at ¶28.

In addition to the materials in the Portal and the in-person training sessions, Dustin Wolff and Stephanie Wolff received extra marketing assistance from the plaintiff. See Reply Declaration of Mark White (DE# 87-1 at ¶¶13-14, 4/21/20) (noting that "on November 7, 2017, SMDS set up a media analysis call for the Wolffs and SMDS's media expert, Ms. Stephanie Ruiz, to discuss various topics, including what kind of radio stations [Dustin Wolff] should target to run advertisements" and that on November 14, 2017, Dustin Wolf participated in an almost hour long "sales training call with [the plaintiff's] sales trainer" where "details of [the plaintiff]'s marketing operations [were discussed] during that call, and to a significant degree.").

On December 14, 2017, Dustin Wolff attended a conference in Las Vegas, Nevada. Reply Declaration of Mark White (DE# 87-1 at ¶15, 4/21/20). At that conference, Mark White "introduced Mr. Wolff to many doctors and influencers, both in and outside [the plaintiff's] network . . . ." Id. Mr. Wolff agreed to do a short, promotional video for GAINSWave. Declaration of Dustin Wolff (DE# 75 at ¶41, 4/17/20). In that video, Mr. Wolff states that after "joining GAINSWave one month ago, we've paid off the investment that we put in . . . GAINSWave has already generated over $22,000 in revenue . . . It's amazing!" Plaintiff's Exhibit 17 (DE# 98-1 at 113, 4/23/20).[5]

On January 4, 2018, Dustin Wolff sought and obtained assistance from the

---

[5] Dustin Wolff maintains that the video "is misleading and does not provide a complete picture." Declaration of Dustin Wolff (DE# 75 at ¶41, 4/17/20).

plaintiff in developing a website for an additional cost of $500.00. Reply Declaration of Mark White (DE# 87-1 at ¶19, 4/21/20).

In February 2018, Dustin Wolff and Stephanie Wolff traveled to Florida to attend SMDS' make-up training session. Declaration of Dustin Wolff (DE# 75 at ¶28, 4/17/20). "The training lasted half a day and comprised the same materials as the Tucson session." Id. During this training session, "Mr. Wolff asked if he could spend extra time with SMDS's marketing team." Reply Declaration of Mark White (DE# 87-1 at ¶20, 4/21/20).

In April 2018, Dustin Wolff returned to Florida to attend an anti-aging conference. Evidentiary Hearing Transcript (DE# 121 at 90, 4/28/20). "[Dustin] Wolff . . . observe[d] how [SMDS] 'pitch[ed]' [its] services to doctors" and "spent time at SMDS's offices and spent hours more with the SMDS marketing team, learning . . . SMDS's business." Reply Declaration of Mark White (DE# 87-1 at ¶21, 4/21/20). Dustin Wolff also went on a boat with Mark White and had dinner with Mr. White, SMDS employees and prospective GAINSWave providers. Evidentiary Hearing Transcript (DE# 121 at 90-91, 4/28/20). During this trip, Dustin Wolff discussed with Mr. White "developing a hand-held advice [sic] that consumers could use in their own home." Reply Declaration of Mark White (DE# 87-1 at ¶23, 4/21/20). Mr. White "responded that [he] had considered such a product, but felt it could harm the GAINSWave physician members unless it was marketed through [the GAINSWave] physician customer base." Id.

Dustin Wolff expressed interest in helping SMDS recruit new GAINSWave doctors in exchange for payment. Evidentiary Hearing Transcript (DE# 121 at 65,

12

4/28/20). On April 16, 2018, Dustin Wolff asked Mr. White for doctor leads and sought marketing advice related to pay-per-click ("PPC") keywords for Novus Anti-Aging Center, Inc. Reply Declaration of Mark White (DE# 87-1 at ¶24, 4/21/20). Pay-per-click or PPC keywords "are terms . . . [purchased] from Google to direct traffic to [a specific web]site." Id. at ¶56. Dustin Wolff also told Mr. White that Novus Anti-Aging Center, Inc. was making $150,000 per month. Id. at ¶24.[6]

The parties dispute whether Dustin Wolff attended a third training session in Los Angeles, California on June 16, 2018. Mr. Wolff testified that he merely helped Mr. White obtain a venue and secure a caterer. Evidentiary Hearing Transcript (DE# 121 at 155, 4/28/20).

At times, Dustin Wolff complained to Mr. White that SMDS was oversaturating the market with GAINSWave providers. Declaration of Dustin Wolff (DE# 75 at ¶¶42-43, 4/17/20). Shortly after Novus Anti-Aging Center, Inc. became a GAINSWave provider it was receiving 15 leads per month. Id. at 44.[7] However, by July 2018, the number of leads it was receiving had dropped to three leads per month. Id.

In September 2018, Mr. Wolff asked Mr. White if he could market Novus Anti-

---

[6] The parties dispute whether the $150,000 included all of Novus Anti-Aging Center, Inc.'s monthly revenue or just the revenue attributable to GAINSWave treatments.

[7] "GAINSWave leads were generated when an individual clicked on a listing for an individual clinic on the GAINSWave directory. Although GAINSWave provided basic contact information for the user, it was the member's responsibility to convert the lead into a paying customer. GAINSWave licensees determined their own price to charge a customer, and often offered discounts to attract customers over competitors, particularly where GAINSWave had saturated the market, leading customers to shop for the lowest-priced clinic." Declaration of Dustin Wolff (DE# 75 at ¶69, 4/17/20).

Aging Center, Inc.'s treatments under the name "Novowave" because Mr. Wolff was doing radio advertising and did not want to drive business to other GAINSWave providers. Reply Declaration of Mark White (DE# 87-1 at ¶33, 4/21/20). Mr. White agreed to this arrangement. Id.

The parties dispute whether the GAINSWave™ Membership Agreement (DE# 76-1, 4/19/20) is still in effect. Dustin Wolff asserts that he informed Mr. White in November 2018, "that Novus wished to discontinue the GAINSWave relationship." Declaration of Dustin Wolff (DE# 75 at ¶45, 4/17/20).

According to Mr. White, Dustin Wolff did not terminate the GAINSWave™ Membership Agreement (DE# 76-1, 4/19/20), but merely "requested that he downgrade his membership to 'Silver.'" Reply Declaration of Mark White (DE# 87-1 at ¶34, 4/21/20). Providers with a Silver membership "have access to [the plaintiff's] password protected Portal and confidential information, but . . . [are] not . . . listed on [the plaintiff's] directory." Id. "Many providers ha[ve] chosen to downgrade their membership because they no longer require the ongoing sales support and account management." Id.

Novus Anti-Aging Center, Inc. continues to pay the plaintiff a reduced monthly fee of $500. The parties dispute the reason for this monthly fee. Dustin Wolff asserts that this is a licensing fee because Mr. White claimed to be "the exclusive licensee of [the'127 Patent] and [that] he was entitled to licensing fees from anyone using ESWT in the treatment of erectile dysfunction." Declaration of Dustin Wolff (DE# 75 at ¶¶46-47, 4/17/20). Mr. White maintains that this fee is for access to the Portal. Declaration of Mark White (DE# 63-1 at ¶97, 4/7/20).

As of November 2018, Novus Anti-Aging Center, Inc. "provides treatment for erectile dysfunction with ESWT under the Novowave™ brand-name. Declaration of Dustin Wolff (DE# 75 at ¶15, 4/17/20).

As of January 2019, Novus Anti-Aging Center, Inc. is not listed as a GAINSWave provider on the plaintiff's website. Id.

**B.    The Rocket**

In March 2018, Dustin Wolff met Jon Hoffman during a medical visit by Mr. Hoffman to the Novus clinic. See Evidentiary Hearing Transcript (DE# 121 at 87, 4/28/20). Dustin Wolff and Mr. Hoffman engaged in a conversation concerning the types of services offered by the Novus clinic. Id. During this conversation, Dustin Wolff mentioned to Mr. Hoffman that "if somebody could . . . develop a low[-]cost home-use device[,] it would serve the 99 percent of the population that could never afford or get over the shame and embarrassment of coming into an actual clinic." Id. Three to four weeks later, Mr. Hoffman returned to the clinic with a prototype of the Rocket. Id. at 88. Dustin Wolff and Mr. Hoffman discussed "the type of value [the Rocket] would provide directly to consumers, . . . if it was efficacious and if it was safe" and "develop[ed] a [business] relationship from there." Id.

Mr. Hoffman is the sole inventor of the Rocket and "hold[s] the assignment to the allowed patent and patent applications that cover the technology underlying the Rocket." Declaration of Jon Hoffman (DE# 69-2 at ¶¶25-26, 4/17/20). At the time Mr. Hoffman developed the Rocket he "was not aware of GAINSWave or any of its marketing and sales information." Id. at ¶40.

15

### C.    Moon Pool, LLC

Moon Pool, LLC is a California limited liability company which does business as Launch Medical. Declaration of Jon Hoffman (DE# 69-2 at ¶¶3-4, 4/17/20). Dustin Wolff and Jon Hoffman are non-member managers of Moon Pool LLC. Declaration of Dustin Wolff (DE# 75 at ¶15, 4/17/20). Mr. Hoffman "oversee[s] the product development, marketing, sales, and day[-]to[-]day management of Moon Pool." Declaration of Jon Hoffman (DE# 69-2 at ¶10, 4/17/20).

Moon Pool, LLC "was created to bring the Rocket to market." Declaration of Jon Hoffman (DE# 69-2 at ¶36, 4/17/20). Moon Pool, LLC "launch[ed] a crowdfunding campaign [for the Rocket] on an established web-based crowd funding platform." Id. at ¶37.

The day after the launch of the crowdfunding campaign, Mr. White "contacted Dustin Wolff by text to state he had seen the Rocket and wanted to discuss" it. Declaration of Jon Hoffman (DE# 69-2 at ¶41, 4/17/20). Mr. White "expressed great excitement about the potential for commercialization of a home-use acoustic wave device" and "referenced [entering into] a partnership or joint venture." Id.

At Mr. White's request, Jon Hoffman and others[8] on behalf of Moon Pool, LLC flew to Miami for an in-person meeting where Mr. White was shown the Rocket prototype. Declaration of Jon Hoffman (DE# 69-2 at ¶42, 4/17/20). The plaintiff and Moon Pool, LLC continued their negotiations and on September 26, 2019, the plaintiff

---

[8] In his declaration, Jon Hoffman uses the word "we." Declaration of Jon Hoffman (DE# 69-2 at ¶42, 4/17/20). It is unclear from the declaration who else traveled to Miami on behalf of Moon Pool, LLC.

16

presented Moon Pool, LLC with a letter of interest ("LOI"). Id. at ¶50. The plaintiff and Moon Pool, LLC exchange several drafts of the LOI and were ultimately unable to reach an agreement. Id. at ¶¶51-53. "The last draft of a letter of intent was sent by [Dustin] Wolff on November 23, 2019." Reply Declaration of Mark White (DE# 87-1 at ¶45, 4/21/20). The parties continued to engage in discussions in an attempt to reach a "commercial resolution" even after the plaintiff filed suit. Id. at ¶50.

According to the plaintiff, at some point, Jon Hoffman told Mr. White, "'we know the Rocket [will] hurt your business.'" Declaration of Mark White (DE# 63-1 at ¶81, 4/7/20). Mr. Hoffman states that what he told Mr. White was that, "this [could] be the best day of your life or the worst day of your life." Declaration of Jon Hoffman (DE# 69-2 at ¶57, 4/17/20). According to Mr. Hoffman, this was not a threat, but rather an expression of Mr. Hoffman's belief that the Rocket was a "disruptive innovation." Id.

"Dustin Wolff designed . . . a direct-to-consumer presale marketing campaign" for the Rocket which was very successful. Declaration of Jon Hoffman (DE# 69-2 at ¶53, 4/17/20).[9] At the same time, Mr. Hoffman attests that "[t]he Rocket's marketing and sales program was developed independently through an independent marketing company Arcadia Marketing, Inc." Id. at ¶80.

Moon Pool, LLC used well-known influencers to market the Rocket. Declaration of Jon Hoffman (DE# 69-2 at ¶53, 4/17/20). These influencers do not have an exclusivity contract with any company. Id.

---

[9] The plaintiff maintains that Dustin Wolff used the plaintiff's trade secrets and confidential business information in marketing the Rocket.

The term "Say Goodbye to Erectile Dysfunction ..." found on GAINSWave's website is a common phrase in the ED industry and "[a] Google search of the phrase returns over 30,000 hits." Declaration of Jon Hoffman (DE# 69-2 at ¶82, 4/17/20).

In January 2020, Moon Pool, LLC also began buying pay-per-click or PPC keywords to market the Rocket. Reply Declaration of Mark White (DE# 87-1 at ¶55, 4/21/20). According to the plaintiff, the plaintiff's "marketing people [taught Dustin] Wolff exactly how to do this, disclosing to Mr. Wolff what [the plaintiff's] key words, or PPC terms were." Id. At the evidentiary hearing, Mr. Wolff testified that he "ha[d] been doing PPC for over ten years." Evidentiary Hearing Transcript (DE# 121 at 16, 4/28/20).

Initially, Mr. White claimed that the defendants could not purchase "GAINSWave" as a pay-per-click or PPC keyword without the plaintiff's permission because it was a trademark. Evidentiary Hearing Transcript (DE# 121 at 55, 4/28/20). Mr. White later clarified that anyone who had not signed a GAINSWave™ Membership Agreement (DE# 76-1, 4/19/20) and who was not using the term "GAINSWave" in their advertising could purchase "GAINSWave" as a PPC keyword without the plaintiff's permission.[10]

---

[10] At the evidentiary hearing, Mr. White testified as follows:

> Q. ... So for any rational party purchasing Google ad words at this point for the treatment of erectile dysfunction, they are going to buy terms like Viagra, Cialis and GAINSWave. Correct?
>
> A. **If they are a GAINSWave member -- first of all, GAINSWave is a trademark term, so typically they can't use the name GAINSWave, but all GAINSWave members need . . . permission to use the word GAINSWave in advertising.** That's what makes our brand valuable.
>
> ***
>
> Q. So let's get some clarity. **Where the party has not used the term**

18

To date, Moon Pool, LLC has received approximately 4,500 pre-orders for the Rocket. Evidentiary Hearing Transcript (DE# 121 at 89, 4/28/20). Moon Pool, LLC expects to receive thousands of orders per month. Id.

If an injunction is not issued, Moon Pool, LLC will ship the Rocket to consumers. Declaration of Jon Hoffman (DE# 69-2 at ¶84, 4/17/20). If an injunction is issued, Moon Pool, LLC will incur significant costs. Id.

## STANDARD OF REVIEW

A preliminary injunction may be granted only if the moving party establishes four factors: (1) a substantial likelihood of success on the merits; (2) an immediate and irreparable injury absent injunctive relief; (3) a threatened harm to the plaintiff that outweighs any injury the injunction would cause to the nonmovant and (4) the injunction will not disserve the public interest. Carillon Imps. v. Frank Pesce Int'l Grp. Ltd., 112 F.3d 1125, 1126 (11th Cir. 1997) (citation omitted).

---

**GAINSWave in their advertising, they are allowed to purchase the term GAINSWave from Google ad words. Correct?**

**A. Correct.**

Q. All right. So, by effect, **any other competitors or marketers in the erectile dysfunction space who is not using your trademark term in their ads can purchase GAINSWave as a key word to increase the visibility of their ads or website.**

Correct?

A. **If they are not [GAINSWave] members, that's correct.**

Evidentiary Hearing Transcript (DE# 121 at 55-56, 4/28/20) (emphasis added).

19

A preliminary injunction is "an extraordinary and drastic remedy not to be granted unless the movant clearly establish[es] the 'burden of persuasion' as to the four requisites." McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998) (citing All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc., 887 F.2d 1535, 1537 (11th Cir. 1989)).

## ANALYSIS

The plaintiff seeks a preliminary injunction to prohibit the defendants and others from "offering, marketing, promoting, or introducing the Rocket . . . for sale" or any other device which "utilizes ESWT for any form of treatment, including erectile dysfunction and other related ailments" and from "utilizing in any way Plaintiff's proprietary trade secrets," "contacting any influencers, customers, or GAINSWave affiliates" and using PPC keywords "associated with GAINSWave, SMDS, or any affiliates." Motion at 19-20.

**I.    Injunctive Relief**

As noted above, in order to obtain a preliminary injunction, the movant must demonstrate: "(1) [that there is] a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that the entry of the relief would serve the public interest." Schiavo ex. rel Schindler v. Schiavo, 403 F.3d 1223, 1225-26 (11th Cir. 2005). The undersigned will address each of these factors below.

**A.    Substantial Likelihood of Success on the Merits**

The first factor, the substantial likelihood of success on the merits, requires an analysis of the plaintiff's ability to make a showing of each of the required elements of

20

the claims asserted. <u>See</u> <u>Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.</u>, 188 F.

Supp. 2d 1350, 1353-55 (S.D. Fla. 2002). In the instant case, the plaintiff seeks a

preliminary injunction as to its breach of contract claim (Count I against Dustin Wolff,

Stephanie Wolff and Novus Anti-Aging Center, Inc.) and its misappropriation of trade

secrets claim (Count II against all defendants). Motion at 10.

 The defendants have attacked both the merits of these claims and the Court's

personal jurisdiction over the defendants. Response at 4, 12-17. The Court will address

the jurisdictional argument first.

### i. Personal Jurisdiction

 To determine whether the Court has personal jurisdiction over a defendant, the

Court must undertake a two-part analysis. <u>Sculptchair v. Century Arts, Ltd.</u>, 94 F.3d

623, 626 (11th Cir. 1996). The Court must:

> [f]irst, . . . determine whether the Florida long-arm statute provides a basis
> for personal jurisdiction. If so, then [the Court] must determine whether
> sufficient minimum contacts exist between the defendant[ ] and [Florida]
> so as to satisfy "traditional notions of fair play and substantial justice"
> under the Due Process Clause of the Fourteenth Amendment.

<u>Sculptchair</u>, 94 F.3d at 626 (citing <u>Robinson v. Giamarco & Bill, P.C.</u>, 74 F.3d 253, 256

(11th Cir. 1996)). Both prongs must be satisfied for personal jurisdiction to exist. <u>Madara</u>

<u>v. Hall</u>, 916 F.2d 1510, 1514 (11th Cir. 1990).

 The defendants argue that the Court has no personal jurisdiction over the

defendants because none of the defendants are Florida residents or are subject to

personal jurisdiction in the state. Response at 1 n. 1.

 For purposes of the instant Motion, the Court does not need to address whether

it has personal jurisdiction over <u>all</u> of the defendants because, as stated in more detail

herein, so long as the Court has personal jurisdiction over one of the defendants, the Court may enjoin the conduct of that defendant's "officers, agents, servants, employees, and attorneys" and "other persons who are in active concert or participation with [those individuals]." Fed. R. Civ. P. 65(d)(2)(B)-(C). For the reasons stated below, the Court finds that it has personal jurisdiction over at least, Novus Anti-Aging Center, Inc.

### (a.)   Florida Long-Arm Statute

The plaintiff identifies three provisions of the Florida long-arm statute which it maintains provide jurisdiction over the defendants. The Florida long-arm statute subjects a non-resident to jurisdiction in Florida for "[c]ommitting a tortious act within this state." Fla. Stat. § 48.193(1)(a)(2). It also subjects a nonresident defendant to jurisdiction in Florida for "[b]reaching a contract in this state by failing to perform acts required by the contract to be performed in this state." Id. § 48.193(1)(a)(7). Finally, a non-resident who "[e]nter[s] into a contract that complies with s. 685.102" is subject to jurisdiction in Florida. Id. § 48.193(1)(a)(9). The Court will address each provision below.

### (i.)   A Contract Complying with Fla. Stat. 685.102

The plaintiff argues that the Court has personal jurisdiction over at least some of the defendants because the GAINSWave™ Membership Agreement (DE# 76-1 at ¶8, 4/19/20) contains a forum selection clause and a waiver of any objections to "venue, personal jurisdiction or that the forum is not convenient." Reply at 11. Subsection (1)(a)(9) of the Florida long-arm statute provides for jurisdiction over a defendant who "enter[s] into a contract that complies with s. 685.102." Fla. Stat. § 48.193(1)(a)(9).

22

Section 685.102 of the Florida Statutes states, in part, that:

(1) Notwithstanding any law that limits the right of a person to maintain an action or proceeding, any person may, to the extent permitted under the United States Constitution, maintain in this state an action or proceeding against any person or other entity residing or located outside this state, **if the action or proceeding arises out of or relates to any contract, agreement, or undertaking for which a choice of the law of this state, in whole or in part, has been made pursuant to s. 685.101** and which contains a provision by which such person or other entity residing or located outside this state agrees to submit to the jurisdiction of the courts of this state.

Fla. Stat. § 685.102(1) (emphasis added). Section 685.101 states that:

The parties to any contract, agreement, or undertaking, contingent or otherwise, **in consideration of or relating to any obligation arising out of a transaction involving in the aggregate not less than $250,000**, the equivalent thereof in any foreign currency, or services or tangible or intangible property, or both, of equivalent value, including a transaction otherwise covered by s. 671.105(1), may, to the extent permitted under the United States Constitution, agree that the law of this state will govern such contract, agreement, or undertaking, the effect thereof and their rights and duties thereunder, in whole or in part, whether or not such contract, agreement, or undertaking bears any relation to this state.

Fla. Stat. § 685.101(1) (emphasis added). "[E]ven if the parties to an agreement do not exchange at least $250,000, § 685.101 may still apply if, an aggregate of more than $250,000 arises from transactions related to the contract." Upofloor Americas, Inc. v. S Squared Sustainable Surfaces, LLC, No. 616CV179ORL37DCI, 2016 WL 5933422, at *6 (M.D. Fla. Oct. 12, 2016).

The defendants maintain that the plaintiff failed to allege the $250,000 minimum threshold in the Amended Complaint (DE# 43, 3/18/20) and otherwise cannot meet this requirement. The plaintiff cites to Dustin Wolff's video where he discloses earnings of $22,000 in the first month and Dustin Wolff's statement to Mark White in April 2018 about earning $150,000 per month. Plaintiff's Exhibit 17 (DE# 98-1 at 113, 4/23/20);

23

Reply Declaration of Mark White (DE# 87-1 at ¶24, 4/21/20). The defendants insist that the video was marketing puffery, that GAINSWave leads tapered off due to market oversaturation and that the $150,000 included all of Novus Anti-Aging Center, Inc.'s monthly revenue not just the revenue attributable to GAINSWave treatments.

For purposes of the instant motion, the Court does not need to resolve the parties dispute over the $250,000 minimum threshold because another provision of the Florida long-arm statute confers personal jurisdiction over Novus Anti-Aging Center, Inc.

### (ii.)   Committing a Tortious Act Within Florida

The plaintiff argues that:

> Defendants stole SMDS' confidential business information and trade secrets from trainings conducted in Florida and from computers located [in] Florida to market a competing product to customers in Florida, and caused injury to SMDS in Florida. Defendants thus committed 'a tortious act . . . within this state' under the meaning of Florida's long-arm statute.

Reply at 12 (quoting Fla. Stat. § 48.193(1)(a)(2)).

In the instant case, Novus Anti-Aging Center, Inc. entered into a contract with a Florida company and remotely gained access to the plaintiff's confidential marketing strategies and other business information. Novus Anti-Aging Center, Inc.'s CEO (Stephanie Wolff) and president (Dustin Wolff) traveled to Florida in February 2018 to receive training from the plaintiff. Declaration of Dustin Wolff (DE# 75 at ¶28, 4/17/20). Dustin Wolff again traveled to Florida in April 2018. During this trip, according to the plaintiff, Dustin Wolff gained additional insight into the plaintiff's trade secrets and marketing strategies and met with Mark White for a business dinner that included plaintiff's employees and prospective GAINSWave providers. Reply Declaration of Mark White (DE# 87-1 at ¶21, 4/21/20); Evidentiary Hearing Transcript (DE# 121 at 90-91,

24

4/28/20). On this trip Dustin Wolff also had a discussion with Mr. White about a hand-

held device for in-home use. Reply Declaration of Mark White (DE# 87-1 at ¶23,

4/21/20). Approximately a month before this trip, Dustin Wolff met Jon Hoffman and had

discussed this type of product. See Evidentiary Hearing Transcript (DE# 121 at 87,

4/28/20). These actions are sufficient to conclude that Novus Anti-Aging Center, Inc.

committed "a tortious act . . . within this state" under the meaning of section

48.193(1)(a)(2).

### (iii)    Breaching a Contract to be Performed in Florida

The plaintiff also argues that the Florida long-arm statute subjects Novus Anti-

Aging Center, Inc. to personal jurisdiction for "[b]reaching a contract in this state by

failing to perform acts required by the contract to be performed in this state." Fla. Stat. §

48.193(1)(a)(7); Reply at 13.

In Kika M2M LLC v. Pittman, this Court determined that a non-compete provision

which did not include a geographical limitation did not meet the requirement that an act

under the contract be performed in Florida. No. 17-60283-CIV, 2017 WL 7732872, at *4

(S.D. Fla. Sept. 5, 2017). In another case, however, the court noted that "under Florida

law, where a contract is silent as to [the] place of performance, the place of

performance is presumed to be where the plaintiff resides." Focus Mgmt. Grp. USA, Inc.

v. King, No. 8:13-CV-1696-T-35AEP, 2014 WL 12639960, at *5 (M.D. Fla. May 13,

2014). Thus, a contract with a non-competition provision could meet the performance in

Florida requirement of section 48.193(1)(a)(7) where, as here, the plaintiff is a Florida

resident. However, the defendant in King also "aver[red] that he performed duties under

the Employment Agreement throughout the country, including in Florida." Id. at *6. The court in King therefore concluded that the case "present[ed] more than a contractual duty to tender performance to a Florida resident" and "included performing an act in Florida." Id. (citation and internal quotation marks omitted).

In any event, the Court does not need to determine whether the GAINSWave™ Membership Agreement required contractual performance in Florida because the Court has already determined that section 48.193(1)(a)(2) (committing a tortious act within Florida) applies to the instant case. "If the forum's long-arm statute provides jurisdiction over one claim, the district court has personal jurisdiction over the entire case so long as the claims arose from the same jurisdiction-generating event." Thomas v. Brown, 504 F. App'x 845, 847 (11th Cir. 2013). Here, the breach of contract claim and the misappropriation of trade secrets claim all arise from the same events.

### (b.)   Due Process

Once the plaintiff provides facts to justify long-arm jurisdiction under the statute, the Court must consider the constitutional requirements of due process before exercising personal jurisdiction over a defendant. International Shoe Co. v. Washington, 326 U.S.310, 316 (1945). The Eleventh Circuit has identified the following factors:

> First, the defendant must have contacts related to or giving rise to the plaintiff's cause of action. Second, the defendant must, through those contacts, have purposefully availed itself of forum benefits. Third, the defendant's contacts with the forum must be such that it could reasonably anticipate being haled into court there.

Fraser v. Smith, 594 F.3d 842, 850 (11th Cir. 2010).

The exercise of personal jurisdiction over Novus Anti-Aging Center, Inc. will not offend traditional notions of fair play and substantial justice. Francosteel Corp. v. M/V

Charm, 19 F.3d 624, 627 (11th Cir. 1994). Novus Anti-Aging Center, Inc. entered into a

contract with the plaintiff, a Florida company, and remotely and through in-person

trainings gained access to the plaintiff's marketing strategies and confidential

information. Through its CEO and president, Novus Anti-Aging Center, Inc., traveled to

Florida where it received training from the plaintiff. Dustin Wolff, Novus Anti-Aging

Center, Inc.'s president, returned to Florida a second time and gained additional insight

into the plaintiff's marketing strategies. While in Florida, Dustin Wolff engaged in a

conversation with Mark White about a hand-held device for in-home use. Reply

Declaration of Mark White (DE# 87-1 at ¶23, 4/21/20). This conversation took place

after Dustin Wolff had had a similar conversation with Jon Hoffman, the sole inventor of

the Rocket. Therefore, the plaintiff's claims "arise out of or relate to" Novus Anti-Aging

Center, Inc.'s contacts with the forum. Fraser, 594 F.3d at 850.

Novus Anti-Aging Center, Inc. also "purposefully availed" itself of the privilege of

conducting activities within the forum state. Novus Anti-Aging Center, Inc.'s president

Dustin Wolff traveled twice to Florida where he obtained training and was provided with

the opportunity to observe the plaintiff's marketing techniques. Dustin Wolff sought

assistance from the plaintiff, a Florida company, with generating additional business

through doctor leads and marketing advice. Reply Declaration of Mark White (DE# 87-1

at ¶24, 4/21/20). Dustin Wolff also sought and obtained assistance from the plaintiff, a

Florida company, in developing a website for an additional cost. Id. at ¶19.

Novus Anti-Aging Center, Inc.'s contacts with Florida were "such that it could

reasonably anticipate being haled into court there. Fraser, 594 F.3d at 850. The

Eleventh Circuit has stated that "[t]he key to any constitutional inquiry into personal jurisdiction is foreseeability." <u>Sun Bank, N.A. v. E.F. Hutton & Co.</u>, 926 F.2d 1030, 1034 (11th Cir. 1991). Here, Novus Anti-Aging Center, Inc. should have foreseen that through its actions and contacts with the forum, it would be haled into court in Florida.

Additionally, Novus Anti-Aging Center, Inc. entered into the GAINSWave™ Membership Agreement which contained a forum selection clause designating Miami-Dade County, Florida as the "mandatory and exclusive venue and jurisdiction for any proceeding to enforce [the] Agreement." <u>See</u> GAINSWave™ Membership Agreement (DE# 76-1 at ¶8, 4/19/20). "Although forum selection clauses cannot be the sole basis of personal jurisdiction, they are a factor that weighs in favor of exercising personal jurisdiction over a non-resident defendant where other grounds exist to exercise such jurisdiction." <u>Implant Innovations, Inc. v. Reeves</u>, No. 05-81133-CIV, 2006 WL 8433714, at *5 (S.D. Fla. Mar. 29, 2006).

In sum, Novus Anti-Aging Center, Inc.'s contacts with Florida are sufficient to subject it to Florida's long-arm statute and the constitutional requirements of due process are met.

Having determined that the Court has personal jurisdiction over at least one defendant, Novus Anti-Aging Center, Inc., the Court will now address the likelihood of the plaintiff's success on the merits of the misappropriation of trade secrets claim (Count II) and the breach of contract claim (Count I).

### ii.    Misappropriation of Trade Secrets

To prevail on a claim for misappropriation of trade secrets under Florida's

Uniform Trade Secrets Act, Fla. Stat. § 688.001 et seq. (hereinafter "FUTSA"), "a

plaintiff must demonstrate that (1) it possessed a 'trade secret' and (2) the secret was

misappropriated." Advantor Sys. Corp. v. DRS Tech. Servs., Inc., 678 F. App'x 839, 853

(11th Cir. 2017) (citing Fla. Stat. § 688.002). The term "'[t]rade secret' means any

information (including methods, techniques, or processes) that (a) derives independent

economic value from not being generally known or readily ascertainable and (b) is the

subject of reasonable efforts to maintain its secrecy" and the term "'[m]isappropriation'

generally means that the secret was acquired by someone who knows or has reason to

know that the secret was improperly obtained or who used improper means to obtain it."

Id. (citing Fla. Stat. § 688.002(2) and (4)).

### (a.)    The Existence of Trade Secrets

The plaintiff identifies as "trade secrets and confidential information" the following

documents and information: "opportunity analyses, unique marketing techniques, sales

strategies, comparison data, pipelines, valuable 'lead-generation' strategies,

customer/client lists and data, business plans and training videos." Motion at 11. The

plaintiff further states that it "developed training courses for physicians and physicians'

assistant groups to provide training – not only in the treatment – but far more

importantly in the sales, marketing and operational aspects of selling the treatment." Id.

The plaintiff has filed with the Court under seal some of the materials it uses to

train medical providers in marketing the product. See Plaintiff's Exhibit 28 (DE# 99,

4/23/20). The defendants have filed a competing exhibit which shows that much of the information in Plaintiff's Exhibit 28 was obtained from other, publicly available sources. See Defendants' Exhibit 92 (DE# 105, 4/25/20). The defendants therefore argue that the plaintiff has failed to establish the existence of a trade secret because the plaintiff's marketing techniques are publicly available from other sources.

"Information that is generally known or readily accessible to third parties cannot qualify for trade secret protection." Am. Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407, 1410 (11th Cir. 1998). However, under Florida law, a trade secret "includes a unique combination of otherwise known components, if the combination differs materially from other methods known in the trade." Sun Crete of Fla., Inc. v. Sundeck Prod., Inc., 452 So. 2d 973, 975 (Fla. 4th DCA 1984). Thus, even if the bases for the information is publicly available from other sources, a unique compilation of that information specifically tailored to a particular market may qualify as a trade secret.

Although the defendants have presented evidence that the techniques in the plaintiff's marketing documents (Plaintiff's Exhibit 28) were based, at least in part, on publicly available, third-party sources, the plaintiff has demonstrated that its marketing techniques and training programs were tailored to the ED market and to a provider's geographic area. For instance, the plaintiff presented evidence that it trained medical providers in California to market the product in a "sexy" manner and trained medical providers in Oklahoma to market the product as a marriage enhancer. The plaintiff also instructed medical providers on how to create "avatars" of their target patients in order to market GAINSWave treatments.

30

The plaintiff has presented evidence that it expended considerable time and money in developing its marketing plan and training program. See Declaration of Mark White (DE# 63-1 at ¶10, 4/7/20) (attesting that Mr. White "devoted nine full months of planning the business[ ] and spent millions of dollars" developing the GAINSWave program). These enhancements to the marketing principles found in third-party sources added economic value to the plaintiff's marketing techniques and training programs as evidenced by the early success Novus Anti-Aging Center, Inc. experienced when it became a GAINSWave provider.[11]

The plaintiff has also presented evidence that other companies which market in-home ESWT products have not had access to the plaintiff's marketing techniques and training and thus, have experienced only limited success. The defendants argue that this claim is speculative. Response at 15. However, the defendants have not presented any competing evidence to refute the plaintiff's assertion. In any event, the Court finds that Novus Anti-Aging Center, Inc.'s own success is sufficient to support a finding that plaintiff's marketing techniques and training programs have economic value beyond the basic marketing principles and techniques derived from third-party sources.

---

[11] The defendants characterize the statement made by Dustin Wolff in a video in December 2017 that Novus Anti-Aging Center, Inc. had generated $22,000 in revenue from GAINSWave treatments shortly after becoming a GAINSWave provider as a "statement . . . solicited by Plaintiff for use as marketing puffery." Response at 14. However, the assertion of $22,000 in revenue was a verifiable, factual statement. See United States v. Martinelli, 454 F.3d 1300, 1317 (11th Cir. 2006) (describing puffery as "exaggerated opinions or hyped-up sales pitches" and distinguishing it from "factual statements that were verifiably refutable"); Thompson v. Procter & Gamble Co., No. 18-CV-60107, 2018 WL 5113052, at *2 (S.D. Fla. Oct. 19, 2018) (noting that "[t]he Eleventh Circuit has found puffery where a representation was 'not the sort of empirically verifiable statement that [could] be affirmatively disproven.'").

**(b.)    Reasonable Steps to Protect Trade Secrets**

The plaintiff has also demonstrated that it took reasonable steps to maintain its

marketing strategies and techniques a secret. The plaintiff required all providers to sign

the Membership Agreement (DE# 76-1, 4/19/20) which contained a restrictive covenant.

The restrictive covenant prohibits providers from creating or marketing sexual wellness

treatments using ESWT or similar technologies:

> Physician therefore agrees that during the Term of this Agreement and for
> two (2) years after this Agreement ends (the "Restrictive Period"),
> **Physician will not create any new or different intellectual property
> use[d] to market, or participate in any group or collective marketing
> program that markets, the treatment of sexual wellness or related
> medical conditions using ESWT or similar technologies.**

Id. (emphasis added).

The plaintiff also maintained its marketing strategies and training materials in a

password-protected section of its website. See Declaration of Mark White (DE# 63-1 at

¶¶ 30-31 (explaining requirements for accessing the Portal including the requirement

that providers sign the Membership Agreement).

The defendants argue that the plaintiff failed to take reasonable steps to protect

its alleged trade secrets. Response at 13-14. The defendants note that access to the

password-protected Portal "was available to any licensee willing to pay a $2[,]000 set-

up fee." Id. at 13. However, the defendants ignore that the plaintiff required every

GAINSWave provider to sign the Membership Agreement containing the restrictive

covenant before gaining access to the Portal. The defendants also note that "Plaintiff

provided Defendant Novus with both a binder and an emailed copy of its written training

materials and training slides, without any restrictions on its use or storage, and without a

single page designated 'Confidential.'" Id. Again, the fact that the plaintiff distributed

documents to Novus Anti-Aging Center, Inc. does not undermine the plaintiff's

misappropriation of trade secrets claim because Novus Anti-Aging Center, Inc., like

every GAINSWave provider, was bound by the terms of the GAINSWave™ Membership

Agreement.

The defendants further note that: "Plaintiff's membership agreement does not

reference any trade secret information; does not require members to label any

information used from the Portal as 'confidential'; and does not restrict the use of any of

its information by the directors, officers or employees of its members." Response at 13.

The defendants further assert that all confidentiality protections in the restrictive

covenant expire two years after the agreement is terminated:

> all confidentiality obligations under the restrictive covenant expire two
> years after the termination of the Agreement. [D.E. 43-1, ¶5]. Had Novus
> received the information in October 2017 and stopped paying the following
> month, the Agreement would permit it to use all information by November
> 2019, before the filing date of the present lawsuit. Indeed, even after
> Plaintiff asserted a trade secret claim against Defendant Novus, Plaintiff
> continued to permit Novus access to the allegedly protected portal.

Id. at 13-14.

The defendants ignore the termination clause in the GAINSWave™ Membership

Agreement which states:

> **TERM & TERMINATION**. The initial term of this Agreement is one (1) year
> from the Effective Date. This Agreement renews automatically for one (1)
> year renewal terms. Together, the initial term and any renewal terms are
> the "Term." This Agreement may be terminated: (a) by mutual agreement
> of the parties; (b) by Physician for cause if SMDS does not cure within
> thirty (30) days after notice; (c) by SMDS for non-payment that is not
> cured within five (5) days after notice; (d) by SMDS for other cause if
> Physician does not cure within thirty (30) days after notice; or (e) by
> SMDS immediately if SMDS reasonably determines Physician risks the

value or reputation of the Intellectual Property or SMDS. **When this Agreement ends, Physician shall immediately: (a) cease using the Intellectual Property (including protocols) and any derivatives; (b) return all Intellectual Property, including the Marketing Tool Kit, and all other [sic].**

(DE# 76-1 at ¶5, 4/19/20) (emphasis added). Thus, the defendants are mistaken when they argue that "[h]ad Novus received the information in October 2017 and stopped paying the following month, the Agreement would permit it to use all information by November 2019." Response at 13.

The defendants also note that they filed some of the plaintiff's alleged trade secrets in the public record with objection from the plaintiff. Response at 14. The defendants cite to two pages they filed as exhibits to an affidavit. The plaintiff has filed under seal 168 pages which it claims are some, but not all, of its trade secrets. See Plaintiff's Exhibit 28 (DE# 99-1, 4/23/20). The unobjected-to publication of two pages by the defendants does not lead the Court to conclude that the plaintiff has failed to take steps to protect its trade secrets.

The Court finds that the plaintiff has taken reasonable measures to keep its marketing strategies and training materials a secret. The plaintiff's marketing strategies, training materials and other documents were password protected and only accessible to individuals who were bound by the terms of the GAINSWave™ Membership Agreement.

### (c.)    Misappropriation of Trade Secrets by the Defendants

In order to prevail on this claim, the plaintiff must also show that its trade secrets were misappropriated by the defendants. "[FUTSA] defines 'misappropriation' to include '[a]cquisition of a trade secret of another by a person who knows or has reason to know

34

that the trade secret was acquired by improper means'" such as "'theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.'" Ocean Commc'ns, Inc. v. The Jewelry Channel, Inc., No. 9:19-CV-81608, 2020 WL 2042393, at *2 (S.D. Fla. Apr. 28, 2020) (quoting Fla. Stat. § 688.002(1) and (2)(a)). Thus, under FUTSA a trade secret may be misappropriated through a breach of a duty to maintain secrecy. Id.

The plaintiff argues that "the evidence is clear that Defendants misappropriated [its] trade secrets" because:

> **[Dustin] Wolff acquired the trade secrets** by agreeing to the terms of the Membership Agreement and making monthly payments to access the Portal; and he did so knowing that the agreement contained a restrictive covenant aimed at protecting SMDS's business advantages provided by the development of the proprietary sales and marketing techniques. [Dustin] Wolff **then turned around, shared those secrets with the other Defendants, and developed, marketed, and sold a competing product in violation of the terms of the Membership Agreement**.

Motion at 12 (emphasis added). The plaintiff argues that the defendants "used . . . [the plaintiff's proprietary] techniques to sell the Rocket product" including "target[ing] SMDS's customers, influencers and the physician network Plaintiff had developed over the years to offer the competing Rocket product" and "purchase[d] certain derivatives of 'GAINSWave' keywords so that Google searches by potential customers for the product would instead lead those individuals to the website [Dustin] Wolff had created to sell the Rocket." Id. at 6-7.

Mr. White's declaration attests that "[Dustin] Wolff copied the SMDS marketing strategy to a tee" and describes the following steps taken by the defendants to market the Rocket: (1) "solicit[ing] many of [the] same influencers [used by the plaintiff] to

35

promote the Rocket system;" (2) causing additional business disruption and market confusion" by "utiliz[ing] certain search keywords" such as GAINSWave "to help drive [internet] traffic and . . . "purchas[ing] those very same keywords to drive traffic to its business;" (3) "copying, the topline of the GAINSWave website [which] states: 'Say Goodbye to Erectile Dysfunction With a Safe and Proven Drug-Free Solution for Men;'" (4) "using on their Novus website links, features, and videos pulled from the GAINSWave website" and (5) "cop[ying] and us[ing] GAINSWave terms and conditions, privacy policy, and treatment description." Declaration of Mark White (DE# 63-1 at ¶¶62-67, 70-72, 4/7/20).

The Court finds that although the plaintiff has shown the existence of trade secrets and that it took steps to protect those trade secrets, based on the evidence presented at this juncture, the plaintiff has not shown that the defendants utilized those trade secrets in marketing the Rocket. The Court notes that none of the examples cited by the plaintiff constitute trade secrets because they are readily ascertainable information.

The plaintiff is not the only company to use influencers to promote a product. Moreover, the identity of the plaintiff's influencers is public knowledge because anyone with a search engine can readily discern the individuals who are promoting the GAINSWave treatment.

Similarly, the defendants' purchase of keywords, such as "GAINSWave" to drive internet traffic to the Rocket's website is not a misappropriation of the plaintiff's trade secrets because anyone can purchase keywords. At the evidentiary hearing, Mr. White

acknowledged that any medical provider seeking to treat ED would purchase PPC keywords such as "Viagra" or "Cialis." Evidentiary Hearing Transcript (DE# 121 at 54, 4/28/20). The purchase of PPC keywords -- including the purchase of the keyword "GAINSWave" -- is not a trade secret. It is commonly known that businesses purchase keywords on search engines to become more visible on internet search results. Dustin Wolff testified that he "ha[d] been doing PPC for over ten years." Evidentiary Hearing Transcript (DE# 121 at 16, 4/28/20). The plaintiff has not identified any PPC keywords which the defendants would not have known, but for their relationship with the plaintiff.[12]

Lastly, copying a tagline – "Say Goodbye to Erectile Dysfunction With a Safe and Proven Drug-Free Solution for Men" -- **from the GAINSWave website**, copying links, videos and features **obtained from the GAINSWave website** and copying "GAINSWave terms and conditions, privacy policy, and treatment description" which are also listed on the **GAINSWave website** are not misappropriations of trade secrets. The plaintiff has not shown that these portions of its website were password-protected. Information published on the GAINSWave website and publicly available is not a trade secret. "Information that is generally known or readily available to third parties generally cannot qualify for trade secret protection under Florida law." Jadael Inc. v. Elliott, No. 6:05-CV-1623-ORLDAB, 2007 WL 2480387, at *7 (M.D. Fla. Aug. 29, 2007).

---

[12] A defendant's use of PPC keywords may be a relevant factor in establishing a "likelihood of confusion as to . . . claims for trademark infringement and false designation of origin" under the Lanham Act. GhostBed, Inc. v. Casper Sleep, Inc., No. 0:15-CV-62571-WPD, 2018 WL 2213008, at *3 (S.D. Fla. May 3, 2018). However, the plaintiff has not cited to any cases where a defendant's use of PPC keywords commonly known in the industry was a misappropriation of trade secrets.

Based on the evidence presented at this juncture in the proceedings, the Court finds that the plaintiff has not demonstrated a substantial likelihood of success on the merits of its misappropriation of trade secrets claim because it has not, at this time, shown the defendants utilized the plaintiff's trade secrets in marketing the Rocket.

The Court's finding does not mean that the plaintiff could not, through additional discovery or otherwise, ultimately prove that the defendants utilized the plaintiff's trade secrets in marketing the Rocket. However, at this time and based on the evidence presented thus far, the Court cannot conclude that the plaintiff has shown a substantial likelihood of success on the merits of its misappropriation of trade secrets claim.

### iii.    Breach of Contract

The plaintiff also seeks a preliminary injunction based on its breach of contract claim against defendants Dustin Wolff, Stephanie Wolff and Novus Anti-Aging Center, Inc. Motion at 10.

The defendants argue that the plaintiff will not prevail on its breach of contract claim because the defendants who are planning to sell the Rocket are not signatories to the GAINSWave™ Membership Agreement (DE# 76-1, 4/19/20). Response at 16. The defendants further argue that the plaintiff cannot prevail on its breach of contract claim against Novus Anti-Aging Center, Inc. because the restrictive covenant in the GAINSWave™ Membership Agreement (DE# 76-1, 4/19/20) is unenforceable under Florida law. Id. at 17.

The Court will address these arguments below.

### (a.)   Parties Subject to the GAINSWave™Membership Agreement

The defendants argue that only Novus Anti-Aging Center, Inc. is a signatory to the GAINSWave™ Membership Agreement (DE# 76-1, 4/19/20) and as such, none of the other defendants are bound by the terms of that contract. Response at 15. The defendants thus reason that since Dustin Wolff (in his personal capacity) and Stephanie Wolff were not signatories to the GAINSWave™ Membership Agreement (DE# 76-1, 4/19/20), then liability "does not attach to Wolff Marketing Enterprises LLC or Moon Pool LLC vicariously through [Dustin Wolff and Stephanie Wolff's] alleged control of the corporate Defendants." Id. at 17.

The plaintiff maintains that it does not matter that not all of the defendants signed the GAINSWave™ Membership Agreement (DE# 76-1, 4/19/20) because "Florida courts have not hesitated to enforce noncompete agreements against both the employee who signed the agreement as well as against the corporation through which the ex-employee conducted business[.]" Motion at 16 (quoting N. Am. Prod. Corp. v. Moore, 196 F. Supp. 2d 1217, 1229 (M.D. Fla. 2002) (report and recommendation) (finding that former employee could not use a "straw man" to avoid obligations under a non-solicitation agreement and recommending that both the former employee and his present employer be enjoined from soliciting plaintiff's customers).

The plaintiff also points to Rule 65(d)(2) of the Federal Rules of Civil Procedure which allows the Court to enjoin not only the parties, but "the parties' officers, agents, servants, employees, . . . . attorneys[ ] and other persons who are in active concert or participation [with those individuals]." Fed. R. Civ. P. 65(d)(2).

The Court finds that the GAINSWave™ Membership Agreement (DE# 76-1, 4/19/20) applies, at the very least, to defendant Novus Anti-Aging Center, Inc. Additionally, pursuant to Fed. R. Civ. P. 65(d)(2), the Court may enjoin Novus Anti-Aging Center, Inc.'s agents including Dustin Wolff and Stephanie Wolff and the companies they control -- Wolff Marketing Enterprises, LLC and Moon Pool LLC -- from acting in such a manner as to circumvent Novus Anti-Aging Center, Inc.'s obligations under the restrictive covenant in the GAINSWave™ Membership Agreement (DE# 76-1, 4/19/20).

### (b.)    Legitimate Business Interests

To enforce a restrictive covenant, Florida law requires that:

> (1) the covenant [be] "set forth in a writing signed by the person against whom enforcement is sought"; (2) "one or more legitimate business interests justify[ ] the restrictive covenant"; and (3) the restriction [be] "reasonably necessary" to protect those legitimate business interests, and the covenant [be] "reasonable in time, area, and line of business."

Am. Restaurants Concepts, Inc. v. Beaches Wings & Grill, Inc., No. 3:12-CV-1298-J-20TEM, 2013 WL 12129644, at *2 (M.D. Fla. Mar. 27, 2013) (citing Fla. Stat. § 542.335(1)(a)-(c)).

The defendants argue that although Novus Anti-Aging Center, Inc. signed the GAINSWave™ Membership Agreement (DE# 76-1, 4/19/20), the restrictive covenant in membership agreement is unenforceable even as to Novus Anti-Aging Center, Inc. "because Plaintiff has neither proven the existence of a legitimate business interest nor that enforcement of the restrictive covenant is reasonably necessary to protect any such interest." Response at 15.

"Under Florida law, restrictive covenants are enforceable to protect 'legitimate

40

business interests.'" <u>Hayes Healthcare Servs., LLC v. Meacham</u>, No. 19-60113-CIV,

2019 WL 2637053, at *3 (S.D. Fla. Feb. 1, 2019) (quoting Fla. Stat. § 542.335(1)(b)).

"Valuable confidential and trade information, even if not a trade secret, may constitute a

legitimate business interest." <u>AutoNation, Inc. v. McMann</u>, No. 17-62250-CIV, 2018 WL

2006868, at *3 (S.D. Fla. Feb. 22, 2018). Examples of legitimate business interests

include:

> (i) trade secrets, as defined in Fla. Stat. § 688.002(4); (ii) valuable
> confidential business or professional information that otherwise does not
> qualify as trade secrets; (iii) customer, patient, or client goodwill
> associated with an ongoing business or professional practice, by way of
> trade name, trademark, service mark, or "trade dress"; (iv) customer,
> patient, or client goodwill associated with a specific geographic location;
> and (v) customer, patient, or client goodwill associated with a specific
> marketing or trade area.

<u>Am. Restaurants Concepts</u>, 2013 WL 12129644, at *3 (citing Fla. Stat. §

542.335(1)(b)).

In <u>Open Magnetic Imaging, Inc. v. Nieves-Garcia</u>, for example, a Florida

appellate court found a legitimate business interest in marketing training and the

creation of a database:

> [The plaintiff]'s marketing representatives, including [the defendant], were
> trained to market [the plaintiff]'s services to area doctors, primarily
> orthopedists and neurologists. As part of their job, marketing
> representatives were expected to compile a database on these physicians
> which contained the nature and idiosyncrasies of their practices, as well
> as information as to their referral patterns and preferences and which
> insurance they accepted. There was evidence that [the plaintiff] had
> created this database system as part of its confidential strategic marketing
> plan.

826 So. 2d 415, 419 (Fla. 3d DCA 2002) (reversing order denying motion for temporary

injunction).

41

The Court finds that the plaintiff provided specialized marketing training to its GAINSWave providers and developed marketing strategies tailored to the individual markets of these providers. As discussed above, the plaintiff spent considerable time and money developing these marketing strategies. See Declaration of Mark White (DE# 63-1 at ¶10, 4/7/20) (attesting that Mr. White "devoted nine full months of planning the business[ ] and spent millions of dollars" developing the GAINSWave program). The evidence presented is sufficient to establish that the plaintiff had a legitimate business interest which it sought to protect through the restrictive covenant in the GAINSWave™ Membership Agreement.

### (c.)   Reasonableness

Restrictive covenants must also be reasonable "with regard to time, area and line of business." Proudfoot Consulting Co. v. Gordon, 576 F.3d 1223, 1231 (11th Cir. 2009) (citing Fla. Stat. § 542.335(1)). In this case, the defendants do not raise any specific challenges to the two-year time period or the lack of a geographic limitation.

Nonetheless, the defendants do challenge the "business scope" of the restrictive covenant as being too broad. Response at 17 (stating that the restrictive covenant is "unenforceable against even Novus because it does not have a clearly defined scope as to line of business"). The defendants note that:

> The Agreement seeks to prevent a licensee from marketing any "treatment of sexual wellness or related medical conditions using ESWT or similar technologies." [D.E. 62, p. 4]. Plaintiff's Answer in the 2019 Georgia lawsuit admits that ESWT "is a very broad term that can be used to refer to any type of Shockwave Therapy" and "is the functional equivalent of using the term "surgery" to describe a heart transplant procedure, instead of the more specific concept of cardiac transplant surgery." Ex. 7, ¶9. Here, Plaintiff seeks to expand that broad scope even further, to include

42

"similar technologies," without defining or even offering any guidance as to what constitutes "similar technology" in this field, much less its legitimate business interest in extending the restrictive covenant to marketing any such treatment.

Id.

The defendants further argue that the plaintiff and the defendants target different markets. Response at 17 (citing letter of interest ("LOI") drafted by the plaintiff as evidence that the "mass consumer market and [the] professional market are two distinct markets with different needs").

The Court finds, based on the evidence presented by the plaintiff, that the restrictive covenant in the GAINSWave™ Membership Agreement (DE# 76-1 at ¶6, 4/19/20) is reasonably necessary to protect the plaintiff's legitimate business interests.

The lack of a geographical limitation does not render the restrictive covenant unreasonable because it does not prohibit all competition. "[A] relatively narrow restriction . . . is not invalid because it fails to contain a geographic limitation." Envtl. Servs., Inc. v. Carter, 9 So. 3d 1258, 1264 (Fla. 5th DCA 2009). Here, the restrictive covenant only prohibits sexual wellness treatments using ESWT or technologies similar to ESWT:

> Physician . . . agrees that during the Term of this Agreement and for two (2) years after this Agreement ends (the "Restrictive Period"), Physician will not create any new or different intellectual property use[d] to market, or participate in any group or collective marketing program that markets, **the treatment of sexual wellness or related medical conditions using ESWT or similar technologies.**

GAINSWave™ Membership Agreement (DE# 76-1 at ¶6, 4/19/20) (emphasis added).

The defendants take issue with the phrase "similar technologies." Response at

43

17. However, the plaintiff has introduced evidence that the Rocket uses ESWT technology. <u>See</u> Declaration of Mark White (DE# 63-1 at ¶61, 4/7/20) (describing the Rocket as "using the same or very similar ESWT technology used by GAINSWave"). Thus, the "similar technologies" phrase is not at issue for purposes of the instant Motion.[13]

The restrictive covenant is also reasonably limited in time -- two years after the termination of the GAINSWave™ Membership Agreement. <u>See</u> <u>Sentry Ins. Co. v. Dunn</u>, 411 So.2d 336 (Fla. 5th DCA 1982) (finding two-year non-compete provision with no geographic limitation reasonable where former employee was only prohibited from serving plaintiff's customers).

Having determined that the restrictive covenant in the GAINSWave™ Membership Agreement (DE# 76-1 at ¶6, 4/19/20) is enforceable under Florida law, the Court will address the substantial likelihood of the plaintiff's success on the merits of the breach of contract claim as to Novus Anti-Aging Center, Inc.

"The elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages." <u>Beck v. Lazard Freres & Co., LLC</u>, 175 F.3d 913, 914 (11th Cir. 1999) (citing <u>Abruzzo v. Haller</u>, 603 So.2d 1338, 1340 (Fla. 1st DCA 1992)). The plaintiff has shown the existence of a valid contract, the GAINSWave™

---

[13] In any event, the remedy for an overbroad restriction (which this is not) is to narrow the scope of the restriction, not to strike down the contractual provision in its entirety. <u>See</u> <u>Envtl. Servs., Inc.</u>, 9 So. 3d at 1262 (stating that "[i]f the restraint is overbroad or unreasonable, the court shall modify the restraint and grant only the relief reasonably necessary to protect such [legitimate business] interest or interests.").

Membership Agreement (DE# 76-1, 4/19/20). The plaintiff has also shown that Novus Anti-Aging Center, Inc., through its agents Dustin Wolff and Stephanie Wolff, materially breached the restrictive covenant by marketing and selling the Rocket, a device using ESWT technology in violation of the GAINSWave™ Membership Agreement (DE# 76-1, 4/19/20). The plaintiff has also shown damages stemming from that breach as will be discussed in the section addressing irreparable injury.

At this juncture in the proceedings and based on the evidence presented, the Court finds that the plaintiff has met its burden of showing a substantial likelihood of success on the merits of its breach of contract claim at least as to Novus Anti-Aging Center, Inc.

**B.      Irreparable Injury**

The Eleventh Circuit has held that merely because "a noncompetition agreement is enforceable does not necessitate the conclusion that its breach will cause . . . irreparable harm." TransUnion Risk & Alternative Data Sols., Inc. v. Challa, 676 F. App'x 822, 826 (11th Cir. 2017). The plaintiff must also show irreparable injury if injunctive relief is not granted.

To establish irreparable injury, the plaintiff must show that it will suffer an injury for which the plaintiff cannot be adequately compensated if, at some later point in time, it prevails on the merits. United States v. Jefferson Cnty., 720 F.2d 1511, 1520 (11th Cir. 1983) Ne. see also Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla., 896 F.2d 1283, 1285 (11th Cir. 1990) (explaining that "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies.").

The plaintiff notes that the GAINSWave™ Membership Agreement stipulates to irreparable harm: "Physician agrees that its breach of this Agreement would damage SMDS irreparably and that money damages would not be sufficient to compensate [Plaintiff]." Motion at 8 (quoting GAINSWave™ Membership Agreement (DE# 76-1 at ¶8, 4/19/20)).[14] The plaintiff also notes that under Florida law, "a 'violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant.'" Id. (citing Fla. Stat. § 542.335(1)(j)).

In addition to the contract language and the aforementioned statutory presumption, the plaintiff argues that the marketing and sale of the Rocket has caused it actual irreparable harm because "[t]he number of doctors signing up for SMDS's services has dropped precipitously since Wolff began marketing the Rocket." Motion at 7; id. at 9 (describing how some potential leads have indicated that they would be opting for the Rocket); id. at 10 ("[s]ince Defendants launched the Rocket, the rate at which SMDS was signing up doctors has dropped by 50%, and the rate at which doctors are 'dropping' GAINSWave has increased more than 100%.").

---

[14]  It is unclear whether a party can stipulate to irreparable harm in a contract. At least in the context of a non-compete agreement between an employer and an employee, one Florida appellate court found that an employer had to prove irreparable harm because an employee could not stipulate away a statutory requirement to obtaining injunctive relief. Spencer Pest Control Co. of Florida, Inc. v. Smith, 637 So.2d 292, 292-293 (Fla. 5th DCA 1994). In the instant case, the Court does not need to resolve this issue, and will not rely on any presumption, because the plaintiff has presented evidence of actual, irreparable harm.

The plaintiff also argues that monetary damages are inadequate because they would not "bring back the physicians who stopped paying for access to the Portal or who chose not to sign up for SMDS' membership because of [Dustin] Wolff's breaches." Motion at 10. Lastly, the plaintiff points out that non-party Jon Hoffman told the plaintiff, ""we know the Rocket [will] hurt your business."" Id. at 9 (quoting Declaration of Mark White (DE# 63-1 at ¶81, 4/7/20)).

The defendant argues that the plaintiff misapplies the law "by equating the breach of an enforceable restrictive covenant with the presence of irreparable injury." Response at 12. However, the plaintiff's assertion of irreparable injury is not based solely on a contract provision and a statutory presumption. The defendants further argue that the plaintiff cannot show irreparable harm because the plaintiff has failed to show a legitimate business interest. Id. at 4-8. For the reasons discussed above, the Court has already determined that the plaintiff has established the existence of a legitimate business interest sufficient to support its breach of contract claim.

The defendants further insist that they are not competitors of the plaintiff:

> Plaintiff is a **marketing company** selling physicians a marketing plan to entice men suffering from erectile dysfunction into buying high-priced treatment packages. Plaintiff has been prohibited from selling devices by the federal Food and Drug Administration. By contrast, **Defendant Moon Pool sells the Rocket, an FDA registered therapeutic device to consumers seeking a low-cost home-based system**. Although the companies' markets are related, they are not competitors, and Defendants' should not be enjoined from creating a new market that Plaintiff lacks the capacity to develop or exploit.

Response at 2 (emphasis added). The defendants cite to the letter of interest ("LOI") drafted by the plaintiff which states that:

47

> Defendant Moon Pool "has developed a home use low intensity
> shockwave treatment (LIST) known as the 'Rocket' intended for the mass
> market consumer segment marketed directly to consumers as an
> alternative to visiting a provider" and the "mass consumer market and
> professional market are two distinct markets with different needs."

Id. at 9.

Notwithstanding these statements, the plaintiff has presented evidence of

patients who consulted with a GAINSWave provider and expressed their intent to use

the Rocket instead. Motion at 7, 10. The Court finds there is sufficient evidence to

conclude that the marketing and sale of the Rocket will irreparably harm the plaintiff's

business.

The defendants also argue that the plaintiff's evidence of irreparable harm based

on a decline in new provider sign-ups and loss of existing providers is "completely

speculative." Response at 10. The defendants suggest that the plaintiff's loss of

GAINSWave providers is likely due to the plaintiff's oversaturation of its markets. Id. at

11 (citing Novus Anti-Aging Center, Inc.'s own complaints to the plaintiff about receiving

only three leads from the plaintiff's website in August 2018 and the deposition of Dr.

Richard Gains regarding complaints of oversaturation in California, Georgia, New

Jersey and Texas). The defendants also attribute the plaintiff's alleged business losses

to the plaintiff's attempts at seeking to enforce an unenforceable patent, the '127 Patent.

Id. Again, the plaintiff provided concrete examples of patients who consulted with a

GAINSWave provider and opted to purchase the Rocket. Motion at 7, 10.

The plaintiff has shown an irreparable injury with respect to its breach of contract

claim. Novus Anti-Aging Center, Inc. entered into a restrictive covenant which prohibited

it from "creat[ing] any new or different intellectual property use[d] to market, or

participate in any group or collective marketing program that markets, the treatment of sexual wellness or related medical conditions using ESWT or similar technologies." GAINSWave™ Membership Agreement (DE# 76-1 at ¶6, 4/19/20). The plaintiff has presented evidence that the Rocket uses ESWT technology. See Declaration of Mark White (DE# 63-1 at ¶61, 4/7/20) (describing the Rocket as "using the same or very similar ESWT technology used by GAINSWave"). The plaintiff has also presented evidence that some of its GAINSWave providers have lost patients because of the Rocket. Motion at 9 (describing how some potential leads have indicated that they would be opting for the Rocket). The Court further finds that the plaintiff will continue to lose providers and prospective providers because the defendants have indicated that, absent an injunction, they intend to continue to market and sell the Rocket.

The defendants claim that any injury to the plaintiff is not irreparable because that injury can be addressed through money damages. Response at 11. The defendants argue that the plaintiff's damages are quantifiable because a decline in new provider sign-ups or loss of existing providers equals a drop in the plaintiff's revenue. However, the damages identified by the plaintiff are not easily quantifiable such that a monetary judgment would redress the damage to the plaintiff's business. See Osmose, Inc. v. Viance, LLC, 612 F.3d 1298, 1320 (11th Cir. 2010) (recognizing loss of goodwill and market position as irreparable harm).

The defendants also argue that the plaintiff's claim of irreparable injury "is belied by [the plaintiff's] failure to timely assert its breach of contract and trade secret claims." Response at 8. Specifically, the defendants note that the plaintiff "delayed filing its claim

49

for breach of contract by almost **five months** and its claim for misappropriation of trade secrets by almost **seven months**." Id. (emphasis in original). The defendants also note that on March 5, 2020, "Plaintiff's CEO Mark White, **while negotiating a resolution** and seeking to pressure Defendant's [sic] into going into business with Plaintiff on the Rocket, told Defendant Dustin Wolff not to worry about the repeated delays in communication because Plaintiff's attorney had assured him, "we have enough time and we could always push the case back if we need to." Id. at 9 (emphasis added).

Generally, "a party's failure to act with speed or urgency in moving for a preliminary injunction . . . undermines a finding of irreparable harm." Wreal, LLC v. Amazon.com, Inc., 840 F.3d 1244, 1248 (11th Cir. 2016). In the instant case, at least part of the delay in filing the lawsuit (and seeking injunctive relief) is attributable to the parties' discussions of "a possible joint venture." Reply at 8. In any event, the Court does not find the, at most, seven-month delay to be unreasonable. See BellSouth Advert. & Publ'g Corp. v. Real Color Pages, Inc., 792 F. Supp. 775, 785 (M.D. Fla. 1991) (finding that "Plaintiff's delay of seven to eight months [was] not an unreasonable amount of delay, and [did] not necessitate the preclusion of a finding of irreparable injury.").

In sum, the plaintiff has shown actual, irreparable harm with respect to its breach of contract claim.

### C.     Balancing of Harms

The plaintiff argues that the balancing of harms favors the issuance of an injunction because "the loss of SMDS's very business and ability to operate in the

future" is at stake and any injury to the defendant is "self-inflicted." Motion at 17. The defendants maintain that they have not caused any harm to the plaintiff. Response at 18 (stating that "Plaintiff's injuries were caused by Plaintiff's own greed, in oversaturating each of its markets, and its malfeasance, in participating in a scheme to defraud [GAINSWave providers] by charging for a license to a patent that Plaintiff admits is unenforceable."). The defendants further state that "[t]he imposition of a preliminary injunction in this case will deny millions of patients who could not otherwise afford therapeutic treatment for erectile dysfunction" and would further the plaintiff's improper goal of "'completely shut[ting] down' the Defendants' businesses." Id.

The plaintiff has shown that it will continue to experience a decline in new GAINSWave providers and a loss of existing GAINSWave providers if an injunction is not issued. On the other hand, the defendants will experience significant business disruptions if an injunction is issued. However, disruptions to the defendants' business stem from Novus Anti-Aging Center, Inc.'s breach of the restrictive covenant. Therefore, the balancing of harms weighs in favor of an injunction. See JTH Tax, Inc. v. Abikarram, No. 19-CV-60328, 2019 WL 2254816, at *4 (S.D. Fla. Mar. 22, 2019) (finding that the balancing of harms favored the issuance of an injunction, in part, because "it [was] likely that Defendants' harms [were] self-inflicted, and stem[med] from the operation of an illegitimate business.").

### D.    Public Interest

The Court should also consider whether an injunction, if issued, will disserve the public interest. The plaintiff argues that the "public interest favors the enforcement of the

restrictive covenant contained within the Membership Agreement because such enforcement encourages parties to adhere to contractual obligations." Motion at 19. The defendants maintain that the issuance of an injunction in the instant case would not serve the public interest because "there are no trade secrets to protect and the asserted restrictive covenant is unenforceable." Response at 18.

This prong weighs in favor of the issuance of an injunction. It is well-settled that public policy favors the enforcement of reasonable restrictive covenants. See Fla. Stat. § 542.335; AutoNation, Inc. v. O'Brien, 347 F. Supp. 2d 1299, 1308 (S.D. Fla. 2004). Having found the restrictive covenant in the GAINSWave™ Membership Agreement (DE# 76-1 at ¶6, 4/19/20) to be reasonable and given that public policy favors the enforcement of reasonable restrictive covenants, the Court concludes that the issuance of a preliminary injunction will not harm the public interest. See Office Depot, Inc. v. Babb, No. 20-CV-80407, 2020 WL 1306984, at *4 (S.D. Fla. Mar. 19, 2020) (noting that "[w]hen freely bargained for, agreed to, and executed, covenants not to compete are in the public interest and necessary to encourage business expansion and growth.").

## II.     Scope of the Injunction

Having determined that the plaintiff is entitled to the issuance of a preliminary injunction on its breach of contract claim against Novus Anti-Aging Center, Inc., the Court must define the scope of the injunction. The plaintiff seeks an injunction which prohibits:

> Defendants Dustin and Stephanie Wolff, Wolff Marketing Enterprises, LLC, Novus Anti-Aging Center, Inc., and Moon Pool LLC, in addition to each of their respective agents, brokers, intermediaries, servants, employees, representatives, contractors, principles, members, affiliates,

successors-in-interest, or anyone acting on each of their behalves, at their direction, or in concert with any of them, from the following:

> a.) offering, marketing, promoting, or introducing the Rocket product for sale;
>
> b.) offering any product that utilizes ESWT for any form of treatment, including erectile dysfunction and other related ailments;
>
> c.) utilizing in any way Plaintiff's proprietary trade secrets, as discussed herein;
>
> d.) contacting any influencers, customers, or GAINSWave affiliates; and
>
> e.) using "keywords" associated with GAINSWave, SMDS, or any affiliates.

Motion at 20-19.

The Court finds that some of the injunctive relief sought by the plaintiff is too broad. The Court will enjoin Novus Anti-Aging Center, Inc. and -- consistent with Fed. R. Civ. P. 65(d) -- Novus Anti-Aging Center, Inc.'s "officers, agents, servants, employees" and "other persons who are in active concert or participation with [those individuals ]" from: (a.) offering, marketing, promoting, or introducing the Rocket for sale; (b.) participating in any marketing program that markets any product that utilizes ESWT for the treatment of sexual wellness or related medical conditions and/or (c.) utilizing in any way the plaintiff's proprietary trade secrets and confidential marketing information. These individuals and entities will also be enjoined from fulfilling any pre-orders or orders for the Rocket. The Court's injunction applies to Novus Anti-Aging Center, Inc. and all of the named defendants, DUSTIN WOLFF, STEPHANIE WOLFF, WOLFF MARKETING ENTERPRISES, LLC, NOVUS ANTI-AGING CENTER, INC., MOON POOL LLC

d/b/a Launch Medical and/or their agents, because they are individuals or entities
described in Fed. R. Civ. P. 65(d)(2)(B) or (C).[15]

The Court is also cognizant of the two-year limitation in the GAINSWave™
Membership Agreement (DE# 76-1 at ¶6, 4/19/20). In the instant case, there is a
dispute over whether Dustin Wolff terminated the GAINSWave™ Membership
Agreement (DE# 76-1, 4/19/20) in November 2018. Declaration of Dustin Wolff
(DE# 75 at ¶45, 4/17/20). Therefore, if the preliminary injunction is still in place,
at that time the defendants may move to lift the injunction provided they can
establish record evidence of the November 2018 termination.

## III.    Posting of a Bond

Having determined that the issuance of a preliminary injunction is warranted in
the instant case, the Court must next address whether the plaintiff should be required to
post a bond.

The defendants state that if the Court issues an injunction, a bond of at least
$945,000 is necessary given Moon Pool LLC's various financial obligations including
"non-refundable contracts." Response at 19. The plaintiff argues that no bond is
required because "[t]he financial numbers provided in Defendants' Response all flow
from [Dustin] Wolff's breach of the contract and his misappropriation of Plaintiff's trade

---

15 The injunction will not prohibit non-party Jon Hoffman from independently marketing and
selling the Rocket under a different name with no involvement from the named defendants
DUSTIN WOLFF, STEPHANIE WOLFF, WOLFF MARKETING ENTERPRISES, LLC,
NOVUS ANTI-AGING CENTER, INC., MOON POOL LLC d/b/a Launch Medical and/or their
agents and without reliance on any marketing strategies or other marketing information
learned from DUSTIN WOLFF, STEPHANIE WOLFF, WOLFF MARKETING
ENTERPRISES, LLC, NOVUS ANTI-AGING CENTER, INC. and MOON POOL LLC d/b/a
Launch Medical and/or their agents.

secrets" and the "posting of a large bond – such as the $945,000 Defendants request – would effectively allow those Defendants to recoup 'losses' they were never entitled to in the first place." Reply at 10.

Rule 65(c) of the Federal Rules of Civil Procedure provides that:

(c) Security. The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The United States, its officers, and its agencies are not required to give security.

Fed. R. Civ. P. 65(c). "[I]t is well-established that the amount of security required by [Rule 65(c)] is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all." BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Servs., LLC, 425 F.3d 964, 971 (11th Cir. 2005) (internal quotations omitted; some alterations in original)).

Jon Hoffman's declaration lists $400,000 for the salaries of nine employees and $50,000 in costs associated with "workers compensation, disability insurance, unemployment insurance, and providing assistance in seeking new employment when terminating the services of these employees." Declaration of Jon Hoffman (DE# 69-2 at ¶84a, 4/17/20). The bond does not need to include both employee salaries and the cost of assisting those employees in obtaining new jobs. The bond need only include the $50,000 in costs. Mr. Hoffman also states that Moon Pool LLC incurred "$200,000 in tooling, manufacturing and building the supply chain for the [Rocket]" and "has committed an additional $485,000 in nonrefundable contracts to further develop the manufacturing and supply chain for different components of the device for 2020." Id. at ¶84b. The bond should only include the $485,000 for future expenditures because

Moon Pool LLC has already incurred the $200,000 in building its supply chain and will presumably be able to reap the benefits of that investment if the injunction is lifted. Moon Pool LLC also anticipates "at least $100,000 in investment at the end of the injunction to restore its place in the marketplace" and $60,000 in insurance premiums which have already been paid. Id. at ¶84(c)-(d). Mr. Hoffman does not specify what the insurance premiums are for (for instance, liability insurance would still have value irrespective of an injunction) or that Moon Pool LLC could not terminate those insurance policies and receive a refund for any unearned premium.

"[T]he purpose of the bond is to compensate the costs and damages sustained by any party found to be wrongfully restrained by the temporary restraining order or preliminary injunction." HPC US FUND 1, L.P. v. Wood, No. 13-61825-CIV, 2014 WL 12496559, at *2 (S.D. Fla. May 9, 2014). The Court finds that a bond in the amount of **$635,000.00** ($50,000 for employee assistance plus $485,000 for future supply chain costs and $100,000 in post-injunction investments) is appropriate.

## CONCLUSION

Based on the foregoing, it is

ORDERED AND ADJUDGED as follows:

1.      The Motion for Preliminary Injunction (DE# 62, 4/6/20) is **GRANTED in part and DENIED in part**.

2.      Defendants DUSTIN WOLFF, STEPHANIE WOLFF, WOLFF MARKETING ENTERPRISES, LLC, NOVUS ANTI-AGING CENTER, INC. and MOON POOL LLC d/b/a Launch Medical, in addition to each of their respective agents, brokers, intermediaries, servants, employees, representatives, contractors, principles, members, affiliates,

successors-in-interest, or anyone acting on each of their behalves, at their direction, or in concert with any of them, are enjoined from:

       a.) offering, marketing, promoting, or introducing the Rocket for sale;

       b.) participating in any marketing program that markets any product that utilizes ESWT for the treatment of sexual wellness or related medical conditions and/or

       c.) utilizing in any way the plaintiff's proprietary trade secrets and confidential marketing information.

3.      Defendants DUSTIN WOLFF, STEPHANIE WOLFF, WOLFF MARKETING ENTERPRISES, LLC, NOVUS ANTI-AGING CENTER, INC. and MOON POOL LLC d/b/a Launch Medical and/or their agents are enjoined from fulfilling any pre-orders or orders for the Rocket.

4.      This injunction does not prohibit non-party Jon Hoffman from independently marketing and selling the Rocket <u>under a different name</u> with no involvement from the named defendants DUSTIN WOLFF, STEPHANIE WOLFF, WOLFF MARKETING ENTERPRISES, LLC, NOVUS ANTI-AGING CENTER, INC., MOON POOL LLC d/b/a Launch Medical and/or their agents and without reliance on any marketing strategies or other marketing information learned from DUSTIN WOLFF, STEPHANIE WOLFF, WOLFF MARKETING ENTERPRISES, LLC, NOVUS ANTI-AGING CENTER, INC. and MOON POOL LLC d/b/a Launch Medical and/or their agents. It is further

ORDERED AND ADJUDGED that any of the defendants may move this Court to lift the injunction if it is still in effect on **November 1, 2020**. Any motion shall be

supported by record evidence that the GAINSWave™ Membership Agreement (DE# 76-1, 4/19/20) was terminated in November 2018.

    DONE AND ORDERED in Chambers at Miami, Florida this **6th** day of May, 2020.

JOHN J. O'SULLIVAN
CHIEF UNITED STATES MAGISTRATE JUDGE